JUDGE KOELTL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ATLANTIS REHABILITATION AND RESIDENTIAL HEALTH CARE FACILITY, LLC; BEACH TERRACE CARE CENTER, INC.; BELLHAVEN CENTER FOR GERIATRIC AND REHABILITATIVE CARE, INC.; BERKSHIRE NURSING HOME, LLC; BRIDGE VIEW NURSING HOME, INC.; CGSR, INC.; CLIFFSIDE NURSING HOME, INC.; CORTLANDT HEALTHCARE, LLC; FAIRVIEW NURSING CARE CENTER, INC.; FOREST VIEW NURSING HOME, INC.; FULTON COMMONS CARE CENTER, INC.; GERMAN MASONIC HOME CORPORATION; GNH LLC; GRANDELL REHABILITATION AND NURSING CENTER, INC.; HAMILTON PARK MULTICARE, LLC; HUDSON VIEW CARE CENTER, INC.; HYDE PARK NURSING HOME, INC.; IROP LLC; KENNETH GAUL II, LLC; LAWRENCE NURSING CARE CENTER, INC.; MAYFAIR CARE CENTER, INC.; MEADOWBROOK CARE CENTER, INC.; MICHAEL MELNICKE; MIDWAY NURSING HOME, INC.; NEW CARLTON REHAB AND NURSING CENTER, LLC; NEW EAST SIDE NURSING HOME, LLC; NEW GLEN OAKS NURSING HOME, INC.; NORTHERN MANHATTAN NURSING HOME, INC.; OCEANSIDE CARE CENTER, INC.; OPOP LLC; PARK GARDENS REHABILITATION AND NURSING CENTER, LLC; PARK HOUSE CARE CENTER, LLC; PARK TERRACE CARE CENTER, INC.; PELHAM PARKWAY NURSING CARE AND REHABILITATION FACILITY, LLC; PONTIAC NURSING HOME, LLC; PROMENADE NURSING HOME, INC.; QUEENS NASSAU NURSING HOME, INC.; RIVER VALLEY CARE CENTER, INC.; ROCKAWAY CARE CENTER LLC; SILVER LAKE SPECIALIZED REHABILITATION AND CARE CENTER, LLC; SMITHTOWN HEALTH CARE MANAGEMENT LLC; SOUTH SHORE NURSING HOME, INC.;

10 CV 3979

Civil Action No.

COMPLAINT FOR INJUNCTION AND DECLARATORY RELIEF

RECEIVED
MAY 13 2010
U.S.D.C. S.D. N.Y.
CASHIERS

| | |
|---|---|
| SUNSHINE CARE CORP.; THE NURSING CARE CENTER AT MEDFORD, INC.; UNION PLAZA NURSING HOME, INC.; VJJ HOLDING COMPANY, LLC; WLOP LLC; WMOP LLC; and WOODCREST REHABILITATION & RESIDENTIAL HEALTH CARE CENTER, LLC | : |
| Plaintiffs, | : |
| -against- | : |
| DAVID A. PATERSON, as Governor of the State of New York; RICHARD F. DAINES, M.D., as Commissioner of the New York State Department of Health; and ROBERT L. MEGNA, as Budget Director of the New York State Division of Budget, | : |
| Defendants. | : |
| | X |

Plaintiffs Atlantis Rehabilitation and Residential Health Care Facility, LLC; Beach Terrace Care Center, Inc.; Bellhaven Center for Geriatric and Rehabilitative Care, Inc.; Berkshire Nursing Home, LLC; Bridge View Nursing Home, Inc.; CGSR, Inc.; Cliffside Nursing Home, Inc.; Cortlandt Healthcare, LLC; Fairview Nursing Care Center, Inc.; Forest View Nursing Home, Inc.; Fulton Commons Care Center, Inc.; German Masonic Home Corporation; GNH LLC; Grandell Rehabilitation and Nursing Center, Inc.; Hamilton Park Multicare, LLC; Hudson View Care Center, Inc.; Hyde Park Nursing Home, Inc.; IROP LLC; Kenneth Gaul II, LLC; Lawrence Nursing Care Center, Inc.; Mayfair Care Center, Inc.; Meadowbrook Care Center, Inc.; Michael Melnicke; Midway Nursing Home, Inc.; New Carlton Rehab and Nursing Center, LLC; New East Side Nursing Home, LLC; New Glen Oaks Nursing Home, Inc.; Northern Manhattan Nursing Home, Inc.; Oceanside Care Center, Inc.; OPOP LLC; Park Gardens Rehabilitation and Nursing Center, LLC; Park House Care Center, LLC; Park Terrace Care

Center, Inc.; Pelham Parkway Nursing Care and Rehabilitation Facility, LLC; Pontiac Nursing Home, LLC; Promenade Nursing Home, Inc.; Queens Nassau Nursing Home, Inc.; River Valley Care Center, Inc.; Rockaway Care Center LLC; Silver Lake Specialized Rehabilitation and Care Center, LLC; Smithtown Health Care Management LLC; South Shore Nursing Home, Inc.; Sunshine Care Corp.; The Nursing Care Center at Medford, Inc.; Union Plaza Nursing Home, Inc.; VJJ Holding Company, LLC; WLOP LLC; WMOP LLC and Woodcrest Rehabilitation and Residential Health Care Center, LLC (together referred to as "Plaintiffs" or the "Facilities"), by their attorneys, Duane Morris LLP, for their complaint against Defendants David A. Paterson, in his capacity as Governor of the State of New York; Richard F. Daines, M.D., in his capacity as the Commissioner, New York State Department of Health ("DOH"); and Robert L. Megna, in his capacity as Budget Director of the New York State Division of Budget (Division of Budget") (together referred to as "Defendants"), allege as follows.

## NATURE OF THE CASE

1. This is an action for injunctive and declaratory relief. Plaintiffs are residential health care facilities which participate in the New York State Medical Assistance ("Medicaid") program. They seek to enjoin the implementation of certain laws and regulations which will drastically reduce, both retroactively and prospectively, the reimbursement Plaintiffs receive for caring for sick and elderly individuals eligible for assistance under the Medicaid program.

2. In adopting the laws and regulations that Plaintiffs seek in this action to enjoin and declare invalid and unenforceable – Part D, Chapter 58 of the Laws of 2009 (the "Laws of 2009") – Defendants did not take into account the level of payments that Plaintiffs and other nursing homes need if they are to provide efficient, economical, and quality nursing facility care, nor did Defendants consider whether the laws would ensure that Medicaid beneficiaries had

access to nursing facility services to the same extent as the general population. Defendants adopted these laws for one reason alone: to meet a budgetary objective.

3. By choosing to participate in Medicaid, New York State obligated itself to comply with the applicable Federal statutes and regulations. Among other things, these Federal statutes and regulations require that the State follow methods and procedures which assure that payments for care rendered to Medicaid recipients are "consistent with efficiency, economy, and quality of care." 42 U.S.C. § 1396a(a)(30)(A). They also require that the State's methods and procedures assure payments that are "sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area." Id.

4. In addition, the Federal statutes and regulations with which New York State is obligated to comply require public notice of changes in New York's Medicaid reimbursement methodology. 42 U.S.C. §1396a(a)(13)(A). No such notice was provided of the changes New York State is planning to implement in its Medicaid reimbursement methodology.

5. Nothing in the Federal laws which govern Medicaid gives states the right to eliminate their budgetary issues by disregarding their obligation to ensure that Medicaid reimbursement rates are sufficient to satisfy the quality of care and access requirements.

6. Absent injunctive and declaratory relief, Plaintiffs will suffer extreme economic hardship which will inhibit their ability to render quality care to their residents, and create a disincentive for admission of Medicaid patients in the future, increasing the likelihood that Medicaid beneficiaries will face difficulty in finding admission to quality residential health care facilities.

7. The injunctive and declaratory relief Plaintiffs seek is necessary to keep New York State from violating Federal law and New York State law and causing irreparable harm to Plaintiffs and the Medicaid beneficiaries they care for by depriving Plaintiffs of the reimbursement they need to provide adequate services.

JURISDICTION AND VENUE

8. Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 because the claims asserted herein arise under the United States Constitution and the laws of the United States. In addition, this Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

9. Since the only relief sought in this action is either prospective or declaratory, this action may be maintained consistent with the Eleventh Amendment to the United States Constitution.

10. Venue is appropriate in this jurisdiction pursuant to 28 U.S.C. § 1391 because at least two of the persons sued in their official capacity maintain offices within this district, the State defendants have offices within this district, and a substantial part of the events giving rise to the claims asserted herein occurred in this district.

PARTIES

11. Atlantis Rehabilitation and Residential Health Care Facility, LLC is a residential health care facility located at 140 St. Edward Street in Brooklyn, New York that is, and at all times relevant hereto, was licensed by the New York State Department of Health under Article 28 of the New York Public Health Law and participated in New York State's Medicaid program.

12. Beach Terrace Care Center, Inc. is a residential health care facility located at 640 West Broadway in Long Beach, New York that is, and at all times relevant hereto, was licensed

by the New York State Department of Health under Article 28 of the New York Public Health Law and participated in New York State's Medicaid program.

13. Bellhaven Center for Geriatric and Rehabilitative Care, Inc. is a residential health care facility located at 110 Beaver Dam Road in Brookhaven, New York that is, and at all times relevant hereto, was licensed by the New York State Department of Health under Article 28 of the New York Public Health Law and participated in New York State's Medicaid program.

14. Berkshire Nursing Home, LLC is a residential health care facility located at 10 Berkshire Road in West Babylon, New York that is, and at all times relevant hereto, was licensed by the New York State Department of Health under Article 28 of the New York Public Health Law and participated in New York State's Medicaid program.

15. Bridge View Nursing Home, Inc. is a residential health care facility located at 143-10 20th Avenue in Whitestone, New York that is, and at all times relevant hereto, was licensed by the New York State Department of Health under Article 28 of the New York Public Health Law and participated in New York State's Medicaid program.

16. CGSR, Inc. d/b/a Meadowbrook Healthcare is a residential health care facility located at 154 Prospect Avenue in Plattsburgh, New York that is, and at all times relevant hereto, was licensed by the New York State Department of Health under Article 28 of the New York Public Health Law and participated in New York State's Medicaid program.

17. Cliffside Nursing Home, Inc. is a residential health care facility located at 119-19 Graham Court in Flushing, New York that is, and at all times relevant hereto, was licensed by the New York State Department of Health under Article 28 of the New York Public Health Law and participated in New York State's Medicaid program.

18. Cortlandt Healthcare, LLC is a residential health care facility located at 110 Oregon Road in Peekskill, New York that is, and at all times relevant hereto, was licensed by the New York State Department of Health under Article 28 of the New York Public Health Law and participated in New York State's Medicaid program.

19. Fairview Nursing Care Center, Inc. is a residential health care facility located at 69-70 Grand Central Parkway in Forest Hills, New York that is, and at all times relevant hereto, was licensed by the New York State Department of Health under Article 28 of the New York Public Health Law and participated in New York State's Medicaid program.

20. Forest View Nursing Home, Inc. is a residential health care facility located at 71-20 110th Street in Forest Hills, New York that is, and at all times relevant hereto, was licensed by the New York State Department of Health under Article 28 of the New York Public Health Law and participated in New York State's Medicaid program.

21. Fulton Commons Care Center, Inc. is a residential health care facility located at 60 Merrick Avenue in East Meadows, New York that is, and at all times relevant hereto, was licensed by the New York State Department of Health under Article 28 of the New York Public Health Law and participated in New York State's Medicaid program.

22. German Masonic Home Corporation d/b/a Dumont Masonic Home is a residential health care facility located at 676 Pelham Road in New Rochelle, New York that is, and at all times relevant hereto, was licensed by the New York State Department of Health under Article 28 of the New York Public Health Law and participated in New York State's Medicaid program.

23. GNH LLC d/b/a Gowanda Rehabilitation and Nursing Center is a residential health care facility located at 100 Miller Street in Gowanda, New York that is, and at all times

relevant hereto, was licensed by the New York State Department of Health under Article 28 of the New York Public Health Law and participated in New York State's Medicaid program.

24. Grandell Rehabilitation and Nursing Center, Inc. is a residential health care facility located at 645 West Broadway in Long Beach, New York that is, and at all times relevant hereto, was licensed by the New York State Department of Health under Article 28 of the New York Public Health Law and participated in New York State's Medicaid program.

25. Hamilton Park Multicare, LLC is a residential health care facility located at 691 92nd Street in Brooklyn, New York that is, and at all times relevant hereto, was licensed by the New York State Department of Health under Article 28 of the New York Public Health Law and participated in New York State's Medicaid program.

26. Hudson View Care Center, Inc. d/b/a Regency Extended Care Center is a residential health care facility located at 65 Ashburton Avenue in Yonkers, New York that is, and at all times relevant hereto, was licensed by the New York State Department of Health under Article 28 of the New York Public Health Law and participated in New York State's Medicaid program.

27. Hyde Park Nursing Home, Inc. d/b/a Renaissance Rehabilitation and Nursing Care Center is a residential health care facility located at 4975 Albany Post Road in Staatsburg, New York that is, and at all times relevant hereto, was licensed by the New York State Department of Health under Article 28 of the New York Public Health Law and participated in New York State's Medicaid program.

28. IROP LLC d/b/a Indian River Rehabilitation and Nursing Center is a residential health care facility located at 17 Madison Street in Granville, New York that is, and at all times

relevant hereto, was licensed by the New York State Department of Health under Article 28 of the New York Public Health Law and participated in New York State's Medicaid program.

29. Kenneth Gaul II, LLC d/b/a Cedar Lodge Nursing Home is a residential health care facility located at 6 Frowein Road in Center Moriches, New York that is, and at all times relevant hereto, was licensed by the New York State Department of Health under Article 28 of the New York Public Health Law and participated in New York State's Medicaid program.

30. Lawrence Nursing Care Center, Inc. is a residential health care facility located at 350 Beach 54th Street in Arverne, New York that is, and at all times relevant hereto, was licensed by the New York State Department of Health under Article 28 of the New York Public Health Law and participated in New York State's Medicaid program.

31. Mayfair Care Center, Inc. is a residential health care facility located at 100 Baldwin Road in Hempstead, New York that is, and at all times relevant hereto, was licensed by the New York State Department of Health under Article 28 of the New York Public Health Law and participated in New York State's Medicaid program.

32. Meadowbrook Care Center, Inc. is a residential health care facility located at 320 West Merrick Road in Freeport, New York that is, and at all times relevant hereto, was licensed by the New York State Department of Health under Article 28 of the New York Public Health Law and participated in New York State's Medicaid program.

33. Michael Melnicke d/b/a Caton Park Nursing Home is a residential health care facility located at 1312 Caton Avenue in Brooklyn, New York that is, and at all times relevant hereto, was licensed by the New York State Department of Health under Article 28 of the New York Public Health Law and participated in New York State's Medicaid program.

34. Midway Nursing Home, Inc. is a residential health care facility located at 69-95 Queens Midtown Expressway in Maspeth, New York that is, and at all times relevant hereto, was licensed by the New York State Department of Health under Article 28 of the New York Public Health Law and participated in New York State's Medicaid program.

35. New Carlton Rehab and Nursing Center, LLC is a residential health care facility located at 405 Carlton Avenue in Brooklyn, New York that is, and at all times relevant hereto, was licensed by the New York State Department of Health under Article 28 of the New York Public Health Law and participated in New York State's Medicaid program.

36. New East Side Nursing Home, LLC is a residential health care facility located at 25 Bialystoker Place in New York, New York that is, and at all times relevant hereto, was licensed by the New York State Department of Health under Article 28 of the New York Public Health Law and participated in New York State's Medicaid program.

37. New Glen Oaks Nursing Home, Inc. is a residential health care facility located at 260-01 79th Avenue in Glen Oaks, New York that is, and at all times relevant hereto, was licensed by the New York State Department of Health under Article 28 of the New York Public Health Law and participated in New York State's Medicaid program.

38. Northern Manhattan Nursing Home, Inc. is a residential health care facility located at 116 East 125th Street in New York, New York that is, and at all times relevant hereto, was licensed by the New York State Department of Health under Article 28 of the New York Public Health Law and participated in New York State's Medicaid program.

39. Oceanside Care Center, Inc. is a residential health care facility located at 2914 Lincoln Avenue in Oceanside, New York that is, and at all times relevant hereto, was licensed

by the New York State Department of Health under Article 28 of the New York Public Health Law and participated in New York State's Medicaid program.

40. OPOP LLC d/b/a Ocean Promenade Nursing Center is a residential health care facility located at 140 Beach 113th Street in Rockaway Park, New York that is, and at all times relevant hereto, was licensed by the New York State Department of Health under Article 28 of the New York Public Health Law and participated in New York State's Medicaid program.

41. Park Gardens Rehabilitation and Nursing Center, LLC ("Park Gardens") is a residential health care facility located at 6585 Broadway in Riverdale, New York that is, and at all times relevant hereto, was licensed by the New York State Department of Health under Article 28 of the New York Public Health Law and participated in New York State's Medicaid program.

42. Park House Care Center, LLC is a residential health care facility located at 128 Beach 115th Street in Rockaway Park, New York that is, and at all times relevant hereto, was licensed by the New York State Department of Health under Article 28 of the New York Public Health Law and participated in New York State's Medicaid program.

43. Park Terrace Care Center, Inc. is a residential health care facility located at 59-20 Van Doren Street in Rego Park, New York that is, and at all times relevant hereto, was licensed by the New York State Department of Health under Article 28 of the New York Public Health Law and participated in New York State's Medicaid program.

44. Pelham Parkway Nursing Care and Rehabilitation Facility, LLC is a residential health care facility located at 2401 Laconia Avenue in Bronx, New York that is, and at all times relevant hereto, was licensed by the New York State Department of Health under Article 28 of the New York Public Health Law and participated in New York State's Medicaid program.

45. Pontiac Nursing Home, LLC is a residential health care facility located at 303 East River Road in Oswego, New York that is, and at all times relevant hereto, was licensed by the New York State Department of Health under Article 28 of the New York Public Health Law and participated in New York State's Medicaid program.

46. Promenade Nursing Home, Inc. ("Promenade") is a residential health care facility located at 140 Beach 114th Street in Rockaway Park, New York that is, and at all times relevant hereto, was licensed by the New York State Department of Health under Article 28 of the New York Public Health Law and participated in New York State's Medicaid program.

47. Queens Nassau Nursing Home, Inc. is a residential health care facility located at 520 Beach 19th Street in Far Rockaway, New York that is, and at all times relevant hereto, was licensed by the New York State Department of Health under Article 28 of the New York Public Health Law and participated in New York State's Medicaid program.

48. River Valley Care Center, Inc. is a residential health care facility located at 140 Main Street in Poughkeepsie, New York that is, and at all times relevant hereto, was licensed by the New York State Department of Health under Article 28 of the New York Public Health Law and participated in New York State's Medicaid program.

49. Rockaway Care Center LLC is a residential health care facility located at 353 Beach 48th Street in Edgemere, New York that is, and at all times relevant hereto, was licensed by the New York State Department of Health under Article 28 of the New York Public Health Law and participated in New York State's Medicaid program.

50. Silver Lake Specialized Rehabilitation and Care Center, LLC ("Silver Lake") is a residential health care facility located at 275 Castleton Avenue in Staten Island, New York that is, and at all times relevant hereto, was licensed by the New York State Department of Health

under Article 28 of the New York Public Health Law and participated in New York State's Medicaid program.

51. Smithtown Health Care Management LLC is a residential health care facility located at 391 North Country Road in Smithtown, New York that is, and at all times relevant hereto, was licensed by the New York State Department of Health under Article 28 of the New York Public Health Law and participated in New York State's Medicaid program.

52. South Shore Nursing Home, Inc. is a residential health care facility located at 275 West Merrick Road in Freeport, New York that is, and at all times relevant hereto, was licensed by the New York State Department of Health under Article 28 of the New York Public Health Law and participated in New York State's Medicaid program.

53. Sunshine Care Corp. d/b/a Hempstead Park Nursing Home is a residential health care facility located at 800 Front Street in Hempstead, New York that is, and at all times relevant hereto, was licensed by the New York State Department of Health under Article 28 of the New York Public Health Law and participated in New York State's Medicaid program.

54. The Nursing Care Center at Medford, Inc. d/b/a Medford Multicare Center for Living is a residential health care facility located at 3115 Horseblock Road in Medford, New York that is, and at all times relevant hereto, was licensed by the New York State Department of Health under Article 28 of the New York Public Health Law and participated in New York State's Medicaid program.

55. Union Plaza Nursing Home, Inc. is a residential health care facility located at 33-23 Union Street in Flushing, New York that is, and at all times relevant hereto, was licensed by the New York State Department of Health under Article 28 of the New York Public Health Law and participated in New York State's Medicaid program.

56. VJJ Holding Company, LLC d/b/a Woodhaven Nursing Home ("Woodhaven") is a residential health care facility located at 1360 Route 112 in Port Jefferson Station, New York that is, and at all times relevant hereto, was licensed by the New York State Department of Health under Article 28 of the New York Public Health Law and participated in New York State's Medicaid program.

57. WLOP LLC d/b/a West Ledge Rehabilitation and Nursing Center is a residential health care facility located at 2000 E. Main Street in Peekskill, New York that is, and at all times relevant hereto, was licensed by the New York State Department of Health under Article 28 of the New York Public Health Law and participated in New York State's Medicaid program.

58. WMOP LLC d/b/a Achieve Rehab and Nursing Facility is a residential health care facility located at 170 Lake Street in Liberty, New York that is, and at all times relevant hereto, was licensed by the New York State Department of Health under Article 28 of the New York Public Health Law and participated in New York State's Medicaid program.

59. Woodcrest Rehabilitation & Residential Health Care Center, LLC is a residential health care facility located at 119-09 26th Avenue in College Point, New York that is, and at all times relevant hereto, was licensed by the New York State Department of Health under Article 28 of the New York Public Health Law and participated in New York State's Medicaid program. David Paterson is the Governor of the State of New York, with offices located in Albany and New York Counties. As Governor, he is the State's highest elected official and is responsible for ensuring that the laws of the State of New York are in compliance with applicable Federal laws and are faithfully executed.

60. Richard F. Daines, M.D. is the Commissioner of Health of the State of New York, with offices located in Albany and New York Counties. As Commissioner of Health, he is

responsible for carrying out the duties assigned by law to him and to DOH, including administration of the Medicaid program.

61. Robert L. Megna is the Director of the Budget of the State of New York, with offices located in Albany County. As Director of the Budget, he is responsible for carrying out the duties assigned by law to him and to the New York State Division of Budget, including approval of Medicaid reimbursement rates established and determined by the Commissioner of Health pursuant to New York Public Health Law § 2807(3).

## BACKGROUND

A. The Medicaid Program

62. The Medicaid program is a joint Federal-state program created under Title XIX of the Federal Social Security Act, codified at 42 U.S.C. § 1396 *et seq*. (the "Social Security Act").

63. Participation by states in the Medicaid program is voluntary. If, however, a state chooses to participate in Medicaid, it is required to comply with certain Federal statutes and regulations.

64. Under the Medicaid program, states that elect to participate in Medicaid are reimbursed in part by the Federal Government for the costs they incur in providing health care services and treatment, including nursing facility services, to low-income and disabled residents who qualify for Medicaid assistance. *See* 42 U.S.C. § 1396.

65. In order for a state to be eligible for Federal financial participation and assistance under the Medicaid program, the state must adopt a State Plan for Medical Assistance that is approved by the U.S. Secretary of Health and Human Services, Centers for Medicare & Medicaid Services ("CMS").

66. Federal and state government agencies share responsibility for funding the Medicaid program. At present, in excess of 50 percent of the costs incurred by the State of New

York in funding nursing facility services under the Medicaid program is reimbursed by the Federal government pursuant to a formula set forth at 42 U.S.C. § 1396b.

67. In order to participate in the Medicaid program, a state must designate as part of its State Plan a "single state agency" within the state to administer the state's Medicaid program. *See* 42 U.S.C. § 1396a(a)(5).

68. New York State has elected to participate in the Medicaid program. In doing so, New York State obligated itself to comply with all applicable Federal statutes and regulations.

69. At all times relevant hereto, New York State has had in effect a state plan for medical assistance (the "State Plan") approved by CMS or its predecessor.

70. At all times relevant hereto, New York State has designated DOH as the "single state agency" to administer and supervise the State Plan. *See* N.Y. Soc. Serv. Law § 363-a.

71. As the "single state agency" administering and supervising the State Plan, DOH must maintain the State Plan in conformity with Federal law, and in particular Title XIX of the Social Security Act. *See* N.Y. Soc. Serv. Law § 363-a(1) and 42 U.S.C. § 1396.

72. In order to comply with Federal law, New York, as a participant in the Medicaid program, must also comply with what is known as the "quality of care" clause of Section 30(A) of the Social Security Act, 42 U.S.C. § 1396a(a)(30)(A) ("Section 30(A)"), which provides in pertinent part:

> (A) A state plan for medical assistance must . . . provide such methods and procedures relating to the utilization of, and payment for, care and services available under the plan . . . as may be necessary . . . to assure that payments are consistent with efficiency, economy, and quality of care . . . .

73. A state Medicaid program must also comply with what is known as the "access" clause of Section 30(A), which provides in pertinent part:

> (A) A state plan for medical assistance must . . . provide such methods and procedures relating to the utilization of, and payment for, care and services available under the plan . . . as may be necessary . . . to assure that payments . . . are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area.

74. Federal regulations promulgated under Section 30(A) require DOH to make payments to providers of Medicaid services that are "sufficient to enlist enough providers so that services under the plan are available to recipients at least to the extent that those services are available to the general population." 42 C.F.R. § 447.204.

75. In order to demonstrate that a state's reimbursement payments comply with Federal statutes, Federal regulations, and the State Plan, and that its reimbursement payments are not arbitrary and capricious, a state must use "methods and procedures" to ensure adequacy of the reimbursement rates prior to implementing new reimbursement rates and methodologies. The rates themselves must also be consistent with "efficiency, economy and quality of care" and sufficient to ensure that enough providers are enlisted so that services under the plan are available to recipients at least to the extent that they are available to the general public.

76. Under Section 1902(a)(13)(A) of the Social Security Act, 42 U.S.C. §1396a(a)(13)(A) ("Section 13(A)"), a state plan also must provide a public process for the determination of rates of payment to providers of nursing facility services, whereby "(i) proposed rates, the methodologies underlying the establishment of such rates, and justifications for the proposed rates are published; (ii) providers, beneficiaries and their representatives and other concerned state residents are given a reasonable opportunity for review and comment on the proposed rates, methodologies and justifications; and (iii) final rates, the methodologies underlying the establishment of such rates, and justifications for such final rates, are published."

77. Federal regulations require that a state Medicaid agency seeking to amend its state plan must do so in accordance with 42 C.F.R. § 430.12(c) and, in accordance with 42 C.F. R. § 447.205, a state must provide public notice of any significant proposed changes in its methods and standards for setting payment rates.

78. Federal regulations at 42 C.F.R. § 447.253 require that, in order to obtain approval of a state plan change in payment methods and standards, a state must present findings to CMS establishing that, *inter alia*, (a) the revised payment rates "are reasonable and adequate to meet the costs that must be incurred by efficiently and economically operated providers to provide services in conformity with applicable State and Federal laws, regulations, and quality and safety standards," 42 C.F.R. § 447.253(b)(1)(i); and (b) "procedures under which the data and methodology used in establishing payment rates are made available to the public," 42 C.F.R. § 447.253(b)(1)(iii)(C).

79. In addition, when a state is proposing significant changes to its methods or standards for setting payment rates for nursing facility services, it must provide assurances that it has complied with the public notice requirements in 42 C.F.R. § 447.205. 42 C.F.R. § 447.253(h).

80. In making changes to New York State's Medicaid reimbursement methodology to implement Part D of Chapter 58 of the Laws of 2009, neither the Legislature nor DOH took into consideration or assessed the effect of the nursing facility Medicaid reimbursement rate cuts on Section 30(A)'s quality of care and access requirements. Rather, the rate cuts were motivated solely by budgetary considerations, and were implemented without the public notice required by the applicable Medicaid regulations.

B. New York's Medicaid Reimbursement Methodology and Rate Reductions

81. Under New York law, the responsibility for determining and establishing the Medicaid reimbursement methodology and rates based thereon for nursing homes in New York State, such as Plaintiffs, has been vested by law in the Commissioner of Health of the State of New York, pursuant to Article 28 of the Public Health Law and, more particularly, §§ 2807 and 2808 thereof, except in instances where the New York State Legislature itself has chosen to prescribe such methodology by law rather than regulation.

82. Under § 2807(3) of the Public Health Law, the Defendant Commissioner of Health is required to establish Medicaid rates for nursing homes that are "reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities."

83. Pursuant to Public Health Law § 2807(3), the Defendant Commissioner of Health must certify the Medicaid rates for nursing homes, to Defendant Director of Budget. Section 2807(3) further provides that, in making such certification, the Commissioner of Health shall certify to the director of Budget that "the proposed rate schedules for payments to hospitals for hospital and health-related services are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities."

84. The methodology used by the Defendant Commissioner of Health to establish and determine Medicaid rates of reimbursement for nursing homes such as Plaintiffs' is set forth in regulations adopted by the New York State Hospital Review and Planning Council, and approved by the Commissioner of Health. Those regulations are contained in Subpart 86-2 of Title 10 of the Official Compilation of Codes, Rules and Regulations of the State of New York. 10 N.Y.C.R.R. 86-2.1 *et seq.* ("Subpart 86-2").

85. For rates effective on and after January 1, 1986, the State of New York adopted a Medicaid reimbursement methodology in which the operating cost component (as distinguished from the capital cost component) of a nursing home's reimbursement rate was based upon a modified pricing system whereby a facility's rate was based upon costs grouped into "direct" services, *i.e.* nursing and related services, and "indirect" services such as housekeeping and administration, that were subject to a "corridor" defined by a maximum ceiling and minimum floor or base, such that a facility would be reimbursed its actual costs if those costs were within the corridor. If operating costs were above the ceiling, the operating cost component of a facility's rate was reduced to the ceiling; conversely, if costs were below the base, the operating cost component of a facility's rate was raised to the minimum base. Under this methodology, set forth in Subpart 86-2, the operating costs reported by a facility were further adjusted to account for variances in costs among different regions of the State, as well as differences in the case-mix of patients/residents (*i.e.,* their acuity of care levels). Costs were also adjusted by a trend factor to account for inflation between the "base period" (when costs were reported) and the actual rate period when rates were to be paid. The calculation resulted in creation of a *per diem* rate which would then be paid to each facility upon its submission of a bill to the Medicaid program for each day that each Medicaid-eligible patient resided in the facility during the rate period.

86. Under the methodology described above, and for all periods prior to April 1, 2009, a facility's particular case-mix was determined based upon its entire resident population, not just its Medicaid residents.

87. The aforementioned methodology adopted calendar year 1983 as the original "base period," provided, however, that new facilities and facilities that underwent transfers of ownership to non-related parties were entitled to have the operating cost component of their rates

calculated based on operating costs incurred during the first 12-month period during which they experienced an overall average occupancy of 90%.

88. Upon information and belief, during the period from 1986 through 2006, the methodology described above, as adjusted from time to time between 1986 and 2006, was used to calculate rates, and this methodology, as adjusted from time to time between 1986 and 2006, was approved and accepted by CMS as part of the State Plan, as required by Federal law.

89. In 2006 the New York State Legislature enacted, and then-Governor Pataki signed into law, Part C of Chapter 109 of the Laws of 2006 (the "2006 Revision") adding, *inter alia*, subdivision 2-b to Public Health Law § 2808. This addition significantly changed New York State's methodology for reimbursing nursing homes under the Medicaid program.

90. Subdivision 2-b of § 2808 of the Public Health Law, as added pursuant to § 47 of the 2006 Revision effective January 1, 2009, provided that the operating cost components of Medicaid reimbursement rates to be paid to nursing homes in New York State were to be calculated based upon 2002 base year costs (except for any facilities whose rates were already being determined on a base year more recent than 2002 because of a change in ownership or because it was a new facility). This provision, colloquially known as the "rebasing provision," was a significant change in New York State's reimbursement methodology which previously had based the operating cost component of a facility's Medicaid reimbursement rate on 1983 reported costs (except for new facilities or those with a qualified change of ownership).

91. The rebasing provision was not applied to all nursing homes. Any facility which, as a result of the new methodology, would receive a Medicaid reimbursement rate that was lower than its current rate would not be subject to rebasing. This provision is colloquially known as the "hold harmless provision."

92. Pursuant to paragraph (g) of subdivision 2-b of Public Health Law § 2808, as added by § 36 of Part C of Chapter 58 of the Laws of 2007, the operating cost component of nursing homes' Medicaid reimbursement rates for periods commencing on and after April 1, 2009 was to be further adjusted by using a case-mix comprised "only of the number of patients properly assessed and reported in each patient classification group and eligible for [Medicaid]," rather than a case-mix of all residents within a facility, as had theretofore been required by the methodology in effect.

93. The changes brought about by § 47 of the 2006 Revision were the culmination of efforts of a joint task force consisting of representatives from the three major provider associations representing nursing homes in the not-for-profit, hospital-based, and proprietary sectors of New York State's long-term care industry.

94. The joint task force presented their findings to representatives of the Legislative and Executive Branches of New York State government, including DOH.

95. Thereafter, a revised Medicaid reimbursement methodology for nursing homes was developed by DOH and was embodied in legislation which ultimately became the 2006 Revision. This legislation addressed problems with the then-existing methodology, including, in particular, the use of a 1983 base year which, by 2006, was more than two decades old and a poor predictor of actual costs incurred by nursing homes more than 20 years later.

96. The bill that became the 2006 Revision was passed by the Legislature and in June 2006 it was signed into law by the Governor.

97. Upon information and belief, the Director of the Budget and/or other State officials estimated that, as a result of the changes adopted by the Legislature and signed into law pursuant to the 2006 Revision, the aggregate State-wide annualized increase in Medicaid

reimbursement to all nursing homes in 2009 would be approximately $460 million above the aggregate amount paid in 2006. This increase was due, in large part, to the fact that, effective January 1, 2009, rates were to be based on 2002 rather than 1983 costs, in order to more accurately reflect the costs of providing nursing home services as well as to implement the hold harmless provision.

98. In adopting the 2006 Revision, the Legislature did not place any cap or limit on the aggregate amount of any increase in the Medicaid reimbursement due nursing homes on and after January 1, 2009.

99. The $460 million estimate of the cost of 2009 Medicaid rate increases statewide did not include an anticipated reduction in expenditures attributable to the changeover from a case-mix based on all patients to a case-mix based only on Medicaid patients that would become effective April 1, 2009. Upon information and belief, the Director of the Budget and/or other State officials initially estimated that this changeover would save the State approximately $250 million, leaving unfunded approximately $210 million.

100. Paragraph (a) of subdivision 2-b of Section 2808 of the Public Health Law, as added by § 47 of the 2006 Revision, further provided "transitional" rates for calendar years 2007 and 2008 to bridge the gap between rates paid under the methodology that existed through December 31, 2006 and the new rebasing methodology that was to take effect on January 1, 2009.

101. Paragraph (a)(ii) of subdivision 2-b of § 2808 of the Public Health Law, as added by § 47 of the 2006 Revision, provided that (a) the aggregate additional amount to be paid statewide to nursing homes in 2007 (as distinguished from 2009) would be limited or "capped" at $137.5 million over and above the aggregate statewide amount paid in 2006, and (b) for 2008

(as distinguished from 2009), the aggregate statewide annual additional amount to be paid was limited to $167.5 million over and above the aggregate expenditures made to reimburse all nursing homes in New York State during calendar year 2006.

102. The foregoing changes in the methods and standards for payment as set forth in the 2006 Revision required Federal State Plan Amendment approval and, upon information and belief, the Defendant Commissioner of Health and/or his predecessors in office duly submitted such changes to CMS in order to obtain such approval.

103. Upon information and belief, in 2008 the State of New York obtained approval from CMS of an amendment to the State Plan with respect to implementation of the changes to the methods and standards of payment for reimbursing nursing homes pursuant to the 2006 Revision, and thereafter Plaintiffs were reimbursed by the Medicaid program for services provided to Medicaid recipients in 2007 and 2008 in accordance with Chapter 109.

104. Under Public Health Law § 2807(7), the Defendant Commissioner of Health is required to notify nursing homes at least 60 days in advance of the effective date of their Medicaid reimbursement rates.

105. On or about December 8, 2008, DOH advised Plaintiffs of their facility-specific Medicaid reimbursement rates for nursing facility services for the period commencing January 1, 2009, indicating that the rate reflected the rebasing provisions implemented by the 2006 Revision and made effective January 1, 2009.

106. Thereafter, Plaintiffs, in reliance upon said rates adopted in accordance with the 2006 Revision and in reliance upon the State Plan Amendment approved by the Federal government in 2008, and in reliance upon the provider agreements they had executed with the State pursuant to 42 U.S.C. § 1396a(a)(27) and 42 C.F.R. 431.107, provided nursing facility

services to eligible Medicaid recipients for the period commencing January 1, 2009, and continued to do so through December 31, 2009.

107. On or about April 7, 2009, Governor Paterson signed into law Chapter 58 of the Laws of 2009.

108. Part D of Chapter 58 of the Laws of 2009, enacted the "Long-Term Care Reform Act," *inter alia*, (a) limited or "capped" the additional amount to be paid in Medicaid reimbursement to nursing homes pursuant to the 2006 Revision for the period from April 1, 2009 through March 31, 2010 at $210 million. The statute instructs Defendants Commissioner of Health and Director of the Budget to "make such proportional adjustments to such rates as are necessary to result in an increase of such aggregate expenditures of two hundred ten million dollars ($210,000,000). . ." (*see* Exhibit A); and (b) eliminated the "trend factor" or inflation adjustment that otherwise would have been applied to such rates for the period from April 1, 2009 through March 31, 2010.

109. On April 29, 2009, DOH published in the New York State Register a Public Notice of its intention to amend the State Plan with changes to the Medicaid rate reimbursement methodology for the periods May 1, 2009 through March 31, 2010 and April 1, 2010 through March 31, 2011 (the "Public Notice"). The Public Notice stated that the "estimated annual net aggregate increase in gross Medicaid expenditures attributable to the changes for state fiscal year 2009/2010 is $210 million." *See* Exhibit B. There is no discussion whatsoever in the Public Notice of the data used to develop the change in the methodology, nor is there any reference to the rate period April 1, 2009 through April 30, 2009.

110. By letter dated January 13, 2010, a sample of which is annexed hereto as Exhibit C, DOH informed each Plaintiff of adjustments to their facility-specific Medicaid reimbursement

rates for the periods April 1, 2009 through April 30, 2009 and May 1, 2009 through December 31, 2009, and advised that the new rates are available on the Health Provider Network, an internet-based service established by DOH for communications with New York health care providers. The January 13, 2010 announcement was an unprecedented retroactive promulgation of new rates, after Plaintiffs had provided services to Medicaid beneficiaries under the earlier promulgated rates for up to 9 months in 2009. These new rates were provided to the Facilities as "notice" rates, with a statement that the rates would not be processed for payment "until all approvals have been received from both CMS and [Division of Budget] . . ." Upon information and belief, each nursing facility participating in the Medicaid program received the January 13, 2010 letter.

111. Although the rates set forth in the January 13, 2010 letter are subject to approval by CMS and the Division of Budget, DOH nevertheless advised Plaintiffs that they would have to submit any appeals which they may have from the "notice" rates within 120 days from January 13, 2010.

112. The January 13, 2010 letter states that the rates calculated by DOH reflect, *inter alia,* (a) "Medicaid only case mix adjustments in accordance with the Chapter 58 of the Laws of 2007, effective April 1, 2009"; and (b) an across-the-board "scale back adjustment."

113. Upon information and belief, it was determined by the Director of the Budget and/or other State officials that the estimate of the cost to the State of 2009 Medicaid rate increases statewide as a result of the "rebasing provision" was approximately $850 million, not $460 million as earlier estimated by Defendants, and the savings to the State from the changeover to a Medicaid-only case mix was approximately $475 million, not $250 million as estimated. Accordingly, Defendants determined that the unfunded amount was $375 million, not

$210 million, and Defendants therefore determined to adjust Medicaid reimbursement rates downward by $165 million so that the increased State spending was limited to the $210 million, as referenced by the Laws of 2009.

114. With regard to the "scale back" referenced in DOH's January 13, 2010 letter, DOH, in effect, made adjustments to the reimbursement due each nursing home – without regard to quality of care or access – by dividing the total amount it had allocated for Medicaid reimbursement and allocating the total in proportion to each nursing home's share of Medicaid revenue as of April 1, 2009. Thus, the January 13, 2010 letter states:

> Chapter 58 of the Laws of 2009 requires rates for the April 1, 2009 through March 31, 2010 period include proportional adjustments which reflect the rebasing provisions of Chapter 109 of the Laws of 2006 and Medicaid only case mix implemented by Chapter 58 of the Laws of 2007 that result in an increase of total statewide Medicaid rates (excluding capital rates) that are no more or no less than $210 million. The proposed [State Plan] amendment now before CMS implementing that $210 million provision has, in accordance with Federal Public Notice requirements, a May 1, 2009 effective date. Thus, the Department calculated Medicaid rates effective April 1, 2009 through April 30, 2009 that do not reflect this adjustment, and Medicaid rates effective May 1, 2009 through December 31, 2009 that adjust such rates that the aggregate adjustment in rates in effect for April 1, 2009 through March 31, 2010 result in aggregate Medicaid expenditures that are no more or no less than $210 million. The proportional adjustments to such rates were determined using each facility's proportionate share of their estimated Medicaid revenue from the April 1, 2009 rates that reflect the impact the rebasing and Medicaid only case mix. The rate adjustment to adjust spending to the required $210 million amount is reflected as the "scale back adjustment" on the May 1, 2009 rate sheet.

115. Prior to issuance of the January 13, 2010 letter advising the Facilities of their revised Medicaid reimbursement rates, neither the Defendants nor any other responsible State officials or employees:

a. published in the State Register or any newspaper of widest circulation in any city within the State having a population in excess of 50,000 the revised Medicaid reimbursement rates for nursing homes that resulted from the changes made pursuant to Chapter 58 of the Laws of 2009, the methodologies underlying the establishment of such rates, their justifications, the expected decreases in expenditures resulting therefrom, or their effective dates; or

b. afforded Plaintiffs a reasonable opportunity to comment on such rates, methodologies and justifications.

116. Upon information and belief, prior to issuance of the January 13, 2010 letter, neither the Defendants nor any other responsible New York State official or employee provided assurances to the appropriate Federal officials pursuant to 42 C.F.R. § 447.253(b)(1)(iii)(C) and (h) that the data and methodology used in establishing the amended Medicaid rate reimbursement was made available to the public and that the public notice requirements of 42 C.F.R. § 447.205 have been satisfied.

117. The noticed adjustments to Plaintiffs' Medicaid reimbursement rates as a result of implementation of the changes made pursuant to the Laws of 2009 represent substantial decreases in the Facilities' Medicaid reimbursement rates caused by significant changes in New York's methods and standards for setting rates that do not meet Federal requirements for, and were not properly described in, notices that Defendants were required to publish before they could become effective.

118. The noticed adjustments to Plaintiff's Medicaid reimbursement rates as a result of implementation of the changes made pursuant to the Laws of 2009 do not take into account, among other things, that those Plaintiffs with special units for ventilator-dependent individuals,

such as Plaintiff Silver Lake and Plaintiff Promenade, must arrange for significantly higher staffing levels than for units which are non-ventilator-dependent. Nonetheless, despite recognition in prior rates of the additional care required to be provided to ventilator dependant patients in DOH-certified units, under the January 13 notice rates reimbursement to many facilities, including Silver Lake and Promenade, for care to patients in these units was reduced. There is no evidence that Defendants made any findings that justified reduced reimbursement rates for services provided in ventilator-dependent units.

119. The noticed adjustments to Plaintiffs' Medicaid reimbursement rates as a result of implementation of changes made pursuant to the Laws of 2009 do not take into account the mandate of §36 of Part C of the Laws of 2007 to use a case mix of Medicaid-eligible individuals in computing the operating cost component of nursing homes' Medicaid reimbursement rates for periods beginning April 1, 2009. Rather than computing this component of the rate based on individuals who are eligible for both Medicare (the Federal program that covers, *inter alia,* nursing facility services for qualified beneficiaries) and Medicaid, Defendants included in the computation only those individuals whose care is actually being paid for by Medicaid but ignoring those who are Medicaid eligible but have their care temporarily paid for by Medicare.

120. The noticed adjustments to Plaintiffs' Medicaid reimbursement rates as a result of implementation of changes made pursuant to the Laws of 2009 undercut the purpose of input from the joint task force, *i.e.*, to ensure that nursing homes received adequate compensation for the services they provide to Medicaid recipients.

C. <u>Failure To Comply With Federal And State Laws</u>

121. There is no evidence that Defendants considered or otherwise took into account either the "quality of care" or the "access" provisions of Section 30(A) prior to notifying the

Facilities of the pending reduction of their Medicaid reimbursement payments pursuant to the Laws of 2009.

122. Plaintiffs also have found no evidence that New York took any steps to determine how the reimbursement reduction would affect compliance with the "quality of care" or "access" provisions of Section 30(A).

123. Defendants cannot show that the new, reduced Medicaid reimbursement rates, in particular the "scale back," properly reflect the costs of providing quality nursing facility services to Medicaid-eligible individuals in the State of New York as required by Section 30(A).

124. There is no evidence that the new, reduced reimbursement payments are "designed to enlist participation" of sufficient providers of Medicaid as required by Section 30(A).

125. Defendants violated New York State law, specifically Public Health Law § 2808(2-b)(g), as added by Part 36 of the Laws of 2007, by failing to include all Medicaid-eligible individuals (*i.e.*, those who are dually eligible for both Medicare and Medicaid) in the case mix component of the Medicaid reimbursement rate methodology.

126. There is no evidence that DOH provided public notice and the opportunity for public comment prior to the January 13, 2010 letter advising the Facilities of the change in methodology in arriving at Medicaid rate reductions, as it was required to do by Section 13(A), 42 C.F.R. § 447.253 and 42 C.F.R. § 447.205. The notice published in the New York State Register on April 29, 2009 does not suffice to satisfy these requirements.

D. <u>Harm To Nursing Homes And Their Residents</u>

127. Unless enjoined, the effect of the proposed reimbursement reduction will be catastrophic for Medicaid recipients across New York, as well as health service providers like

the Facilities. The rate cut will result in the reimbursement for nursing facility services being cut so drastically that facilities including the Plaintiffs may be forced to curtail services; lay off employees, risking compromise to the quality of care; where possible, discourage Medicaid admissions in favor of Medicare or private insurance paid patients whose rates are not subject to these drastic reimbursement cuts; file for Chapter 11 bankruptcy protection, clearly posing a danger to the orderly care of patients; or, in some cases, cause the Facilities to cease operations altogether.

128. Unlike most private businesses, nursing homes are regulated and, in response to drastic reductions in Medicaid reimbursement, cannot simply reduce costs proportionately. There are limitations on the cost controls that facilities can put in place, certain staff are mandated by regulation, and of course when dealing with human lives and frail elderly residents, some economies are simply impossible.

129. The licensed operator of Plaintiff Park Gardens and its accountants have stated that the proposed Medicaid reimbursement rates fall far short of covering the costs of providing nursing home services to Medicaid-eligible individuals at Park Gardens. The operator has stated that he cannot afford services sufficient to provide the level of care required by Federal regulations to Medicaid patients where the reimbursement paid is below the actual cost of providing such care. Therefore, if the Medicaid rates proposed in the January 13, 2010 letter to New York nursing homes go into effect, Park Gardens may be forced to lay off employees and make cuts to services provided to Park Gardens' residents, with possible compromise to the quality of care to the residents. The operator and its accountants have estimated that the impact of the proposed change to the reimbursement methodology with respect to use of Medicaid-only patients to calculate the case-mix component of the reimbursement rate and the scale back in

reimbursement rate for the seven-month period May 1, 2009 to December 31, 2009, will be $8.61 per patient day. Having an average of 64,404 Medicaid patient days, the impact to Park Gardens for this seven-month period is estimated at $554,518.

130. The licensed operator of Plaintiff Woodhaven and its accountants have stated that the proposed Medicaid reimbursement rates fall far short of covering the costs of providing nursing home services to Medicaid-eligible individuals at Woodhaven. The operator has stated that he cannot afford services sufficient to provide the level of care required by Federal regulations to Medicaid patients where the reimbursement paid is below the actual cost of providing such care. Therefore, if the Medicaid rates proposed in the January 13, 2010 letter to New York nursing homes go into effect, Woodhaven may be forced to lay off employees and make cuts to services provided to Woodhaven's residents, with possible compromise to the quality of care to the residents. The operator and its accountants have estimated that the cost of the proposed change to the reimbursement methodology with respect to use of Medicaid-only patients to calculate the case mix component of the reimbursement rate and the scale back in reimbursement rate, for the period May 1, 2009 to December 31, 2009 will be $15.42 per patient day. Having an average of 32,569 Medicaid patient days, the impact to Woodhaven for this seven-month period is estimated at $502,214.

131. If the laws that Plaintiffs seek to enjoin in this action are allowed to go into effect, frail, elderly Medicaid-eligible individuals may lose access to the quality 24-hour skilled nursing care they require in order to "attain or maintain the highest practicable physical, mental and psychosocial well-being of each resident," as required by 42 U.S.C. § 1395i-(b)(2). *See also* 42 C.F.R. § 483.25.

132. Nursing homes and trade associations representing them have made every effort, including participation in meetings with DOH staff, to alert DOH and the Governor's office, to explain the detrimental effects of the planned reimbursement reduction pursuant to the Laws of 2009 on actual patient access and quality of care. The Plaintiffs regard this lawsuit as a last resort that they sought to avoid. The Defendants have left the Facilities with no choice but to seek injunctive relief.

133. In short, there is real and immediate risk of harm to the Facilities and Medicaid recipients due to the Medicaid reimbursement reduction implemented pursuant to the Laws of 2009.

## FIRST CLAIM FOR RELIEF

### (Injunctive Relief Based on Violation of 42 U.S.C. § 1396a(1)(30)(A) and the Supremacy Clause)

134. Plaintiffs repeat and reallege Paragraphs 1 through 133 as if set forth fully herein.

135. Under the Supremacy Clause of the United States Constitution, U.S. Const. art. VI, cl. 2, the Constitution "and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

136. By choosing to participate in Medicaid, the State of New York obligated itself to comply with certain Federal statutes and regulations, including Sections 30(A).

137. Pursuant to Section 30(A), Defendants had a duty to consider efficiency, economy, quality of care, and equality of access when establishing reimbursement rates. Specifically, Section 30(A) required New York to "provide such methods and procedures relating to . . . payment for, care and services available under the plan . . . as may be necessary . . . to assure that payments are consistent with efficiency, economy, and quality of care and are

sufficient to enlist enough providers so that care and services are available . . . at least to the extent that such care and services are available to the general population in the geographic area."

138. Defendants violated Section 30(A) by implementing a Medicaid reimbursement rate reduction without giving sufficient weight to – or even considering – the impact of the rate reduction on quality of care or access for Medicaid beneficiaries.

139. There is no evidence that Defendants intend to comply with the requirements of Section 30(A) prior to implementing the reimbursement rate reductions disclosed in DOH's January 13, 2010 letter to the Facilities.

140. Defendants' new Medicaid reimbursement rates do not satisfy the requirements of Section 30(A) because reimbursement will not be sufficient to assure "quality of care" and "access to services."

141. In establishing the new Medicaid reimbursement rates, Defendants took nothing into account other than budgetary considerations.

142. Defendants' reimbursement methodology violates the Supremacy Clause and is therefore preempted by Federal law. By virtue of the foregoing, enforcement of Part D of Chapter 58 of the Laws of 2009 and the purported rates established by the January 13, 2010 notice should be enjoined.

143. There is no administrative remedy available to challenge the statutory and regulatory promulgation complained of herein.

144. Plaintiffs have no adequate remedy at law.

## SECOND CLAIM FOR RELIEF

**(Injunctive Relief Based on Violation of 42 U.S.C. § 1396a(a)(13)(A) and the Supremacy Clause)**

145. Plaintiffs repeat and reallege Paragraphs 1 through 144 as if set forth fully herein.

146. Pursuant to Section 13(A), in establishing reimbursement rates for nursing homes, New York was required to provide a public process under which (a) proposed rates, the methodologies underlying the establishment of such rates, and justifications for the proposed rates are published; (b) providers, beneficiaries and their representatives and other concerned state residents are given a reasonable opportunity for review and comment on the proposed rates, methodologies and justifications; and (c) final rates, the methodologies underlying the establishment of such rates, and justifications for such final rates, are published.

147. Defendants' new Medicaid reimbursement rates were established without complying with the public process required by Section 13(A). As such, they violate the Supremacy Clause and are therefore preempted by Federal law.

148. By virtue of the foregoing, enforcement of Part D of Chapter 58 of the Laws of 2009 and the purported rates established by the January 13, 2010 notice should be enjoined.

149. There is no administrative remedy available to challenge the statutory and regulatory promulgations complained of herein.

150. Plaintiffs have no adequate remedy at law.

## THIRD CLAIM FOR RELIEF

**(Injunctive Relief Based on Violation of New York State Law)**

151. Plaintiffs repeat and reallege Paragraphs 1 through 150 as if set forth fully herein.

152. Defendants also violated New York State Public Health Law § 2808(2-b)(g), as added by Part 36 of the Laws of 2007, by failing to include all Medicaid-eligible individuals (*i.e.*,

including those who are dually eligible for both Medicare and Medicaid as well as those whose care is paid for by Medicaid) in the computation of the case mix component of the Medicaid reimbursement rate methodology. Accordingly, implementation of the methodology should be enjoined.

153. There is no administrative remedy available to challenge the statutory and regulatory promulgations complained of herein.

154. Plaintiffs have no adequate remedy at law.

**FOURTH CLAIM FOR RELIEF**

**(Injunctive Relief and Declaratory Judgment that Medicaid Reimbursement Rate Reductions for Patients in Ventilator-Dependant State-certified Units Violates Federal and State Law)**

155. Plaintiffs repeat and reallege Paragraphs 1 through 154 as if fully set forth herein.

156. In promulgating the January 13, 2010 notice rates, defendants did not give consideration to the costs involved in providing care to patients in State-certified units for ventilator dependent patients.

157. No findings of sufficiency of the rates were made, in violation of the provisions of Section 13(A).

158. The failure to promulgate adequate rates for reimbursement for care of ventilator-dependent patients in State-certified units will result in facilities being unable to provide quality of care to such ventilator-dependent patients, and will have the effect of discouraging facilities from admitting such patients to their facilities, both in violation of Section 30(A).

159. The failure to include the increased costs of providing care to ventilator-dependent patients in State-certified units violates the requirement in New York Public Health Law § 2807(3) that rates by "reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities."

160. There is no administrative remedy available to challenge the regulatory promulgation complained of herein.

161. Plaintiffs have no adequate remedy at law.

**FIFTH CLAIM FOR RELIEF**

**(Declaratory Judgment that the Medicaid Reimbursement Rate Reduction Pursuant to the Laws of 2009 Violates Federal and State Law)**

162. Plaintiffs repeat and reallege Paragraphs 1 through 161 as if fully set forth herein.

163. By reason of the foregoing, an actual controversy exists between the parties concerning whether the reimbursement reduction set forth in DOH's January 13, 2010 letter to the Facilities violates Sections 30(A) and 13(A) of the Social Security Act. Accordingly, to clarify the legal relations of the parties, this Court should issue declaratory relief pursuant to 28 U.S.C. § 2201.

WHEREFORE, Plaintiffs demand judgment as follows:

1) On the First, Second, Third and Fourth Claims for Relief, preliminarily and permanently enjoining Defendants, their agents, servants, employees, successors, assigns, and all those acting in concert with them from (a) implementing the Medicaid rate reductions applicable to Plaintiffs embodied in Part D of Chapter 58 of the Laws of 2009 and (b) paying reimbursement rates lower than those in effect on April 1, 2009;

2) On the Fourth Claim for Relief, declaring that the Medicaid rate reductions applicable to those Plaintiffs providing care to ventilator-dependent patients in State-certified units are unconstitutional, void, and unenforceable;

3) On the Fifth Claim for Relief, declaring that the Medicaid rate reductions applicable to Plaintiffs embodied in Part D of Chapter 58 of the Laws of 2009 are unconstitutional, void, and unenforceable; and

4) Granting such other and further relief to Plaintiffs as to the Court may seem just and proper, including an award of costs and attorneys' fees.

Dated: New York, New York
May 12, 2010

DUANE MORRIS LLP

By: ______________________
Jerome T. Levy
1540 Broadway
New York, New York 10036
Tel. (212) 692-1000
Fax: (212) 692-1020
Attorneys for Plaintiffs

Of Counsel:
Susan V. Kayser, Esq.
Fran M. Jacobs, Esq.

# EXHIBIT A

**STATUS:**
**A158-B** Budget Same as Uni. S 58-B BUDGET
Budget Bills
TITLE....Enacts into law major components of legislation necessary to implement the health and mental hygiene budget for the 2009-2010 state fiscal plan
**This bill is not active in the current session.**

| | |
|---|---|
| 01/07/09 | referred to ways and means |
| 01/21/09 | amend and recommit to ways and means |
| 01/21/09 | print number 158a |
| 03/28/09 | amend (t) and recommit to ways and means |
| 03/28/09 | print number 158b |
| 03/31/09 | reported referred to rules |
| 03/31/09 | reported |
| 03/31/09 | rules report cal.20 |
| 03/31/09 | ordered to third reading rules cal.20 |
| 03/31/09 | motion to amend lost |
| 03/31/09 | passed assembly |
| 03/31/09 | delivered to senate |
| 03/31/09 | REFERRED TO FINANCE |
| 03/31/09 | SUBSTITUTED FOR S58B |
| 03/31/09 | 3RD READING CAL.137 |
| 04/03/09 | MOTION TO AMEND LOST |
| 04/03/09 | PASSED SENATE |
| 04/03/09 | RETURNED TO ASSEMBLY |
| 04/03/09 | delivered to governor |
| 04/07/09 | signed chap.58 |

**BILL TEXT:**

# STATE OF NEW YORK

S. 58--B A. 158--B

## SENATE - ASSEMBLY

(Prefiled)

January 7, 2009

IN SENATE -- A BUDGET BILL, submitted by the Governor pursuant to article seven of the Constitution -- read twice and ordered printed, and when printed to be committed to the Committee on Finance -- committee discharged, bill amended, ordered reprinted as amended and recommitted to said committee -- committee discharged, bill amended, ordered reprinted as amended and recommitted to said committee

IN ASSEMBLY -- A BUDGET BILL, submitted by the Governor pursuant to article seven of the Constitution -- read once and referred to the Committee on Ways and Means -- committee discharged, bill amended, ordered reprinted as amended and recommitted to said committee --

again reported from said committee with amendments, ordered reprinted as amended and recommitted to said committee

AN ACT to amend the public health law and the elder law, in relation to the financing for certain provisions of the public health law, making modifications to the childhood lead poisoning primary prevention program and amending provisions relating to the long term care insurance education and outreach program (Part A); to amend the public health law and the social services law, in relation to long term home health care programs; to amend part C of chapter 58 of the laws of 2007 amending the social services law and other laws relating to enacting major components of legislation necessary to implement the health and mental hygiene budget for the 2007-2008 state fiscal year, in relation to the effectiveness of certain provisions of such chapter; to amend the public health law, in relation to payments under the medical assistance program; to amend the public health law and chapter 474 of the laws of 1996, amending the education law and other laws relating to rates for residential health care facilities, in relation to reimbursements; to amend chapter 884 of the laws of 1990, amending the public health law relating to authorizing bad debt and charity care allowances for certified home health agencies, in relation to the effectiveness thereof; to amend chapter 81 of the laws of 1995, amending the public health law and other laws relating to medical reimbursement and welfare reform, in relation to reimbursements and the effectiveness thereof; to amend chapter 639 of the laws of 1996, amending the public health law and other laws relating to welfare

EXPLANATION--Matter in *italics* (underscored) is new; matter in brackets [-] is old law to be omitted.

LBD12371-03-9

affect the expiration of such section and shall be deemed to expire therewith;

(t) the amendments to paragraph (c) of subdivision 5-a of section 2807-k of the public health law made by section one hundred two of this act shall not affect the expiration of such subdivision and shall be deemed to expire therewith; and

(u) section twenty-seven shall be deemed effective on and after January 1, 2010, provided, however, that with regard to smoking cessation counseling services provided to pregnant women pursuant to paragraph (s) of subdivision 2 of section 365-a of the social services law such section twenty-seven shall be deemed effective on and after March 1, 2009, and with regard to screening, brief intervention, referral and treatment provided pursuant to paragraph (u) of subdivision 2 of section 365-a of the social services law, such sections shall be deemed effective on and after April 1, 2009.

PART D

Section 1. The legislature finds that New York leads the nation in Medicaid spending on long-term care services and that Medicaid spending on home and personal care services are among the fastest growing areas of Medicaid expenditure despite the fact that the number of beneficiaries receiving these services has not increased. Current processes for assessing the service needs of elderly and disabled beneficiaries do not consistently result in appropriate placement and services and show wide variation across the state. Current reimbursement levels and methodologies do not ensure quality or efficiency, with providers in the same community serving comparable populations receiving markedly different Medicaid payments. It is the intent of this legislation to ensure that elderly and disabled beneficiaries have access to the right level of care in the most appropriate setting; to implement transparent and accurate reimbursement systems for nursing and home care services; and to reward quality and efficiency as well as to make targeted investments to improve long-term care services.

§ 1-a. Short title. This act shall be known and may be cited as "The Long-Term Care Reform Act".

§ 2. Notwithstanding paragraph (b) of subdivision 2-b of section 2808 of the public health law or any other contrary provision of law, with regard to adjustments to medicaid rates of payment for inpatient services provided by residential health care facilities for the period April 1, 2009 through March 31, 2010, made pursuant to paragraph (b) of subdivision 2-b of section 2808 of the public health law, the commissioner of health and the director of the budget shall, upon a determination that such adjustments, including the application of adjustments authorized by the provisions of paragraph (g) of subdivision 2-b of section 2808 of the public health law, shall result in an aggregate increase in total Medicaid rates of payment for such services for such period that is less than or more than two hundred ten million dollars ($210,000,000), make such proportional adjustments to such rates as are necessary to result in an increase of such aggregate expenditures of two hundred ten million dollars ($210,000,000), and provided further, however, that the operating component of such rates for the period April 1, 2009 through March 31, 2010 shall not be subject to case mix adjustments pursuant to subparagraph (ii) of paragraph (b) of subdivision 2-b of section 2808 of the public health law, as otherwise scheduled pursuant to such subparagraph for January of 2010, and provided further, however,

that notwithstanding subdivision 2-c of section 2808 of the public health law or any other contrary provision of law, with regard to adjustments to inpatient rates of payment made pursuant to subdivision 2-c of section 2808 of the public health law for inpatient services provided by residential health care facilities for the period April 1, 2010 through March 31, 2011, the commissioner of health and the director of the budget shall, upon a determination by such commissioner and such director that such rate adjustments shall, prior to the application of any applicable adjustment for inflation, result in an aggregate increase in total Medicaid rates of payment for such services, make such proportional adjustments to such rates as are necessary to reduce such total aggregate rate adjustments such that the aggregate total reflects no such increase. Adjustments made pursuant to this section shall not be subject to subsequent correction or reconciliation.

§ 3. Subparagraph (i) of paragraph (b) of subdivision 2-b of section 2808 of the public health law, as amended by section 3 of part I of chapter 2 of the laws of 2009, is amended to read as follows:

(i) Subject to the provisions of subparagraphs (ii) through (xiv) of this paragraph, for periods on and after April first, two thousand nine <u>through March thirty-first, two thousand ten</u> the operating cost component of rates of payment shall reflect allowable operating costs as reported in each facility's cost report for the two thousand two calendar year, as adjusted for inflation on an annual basis in accordance with the methodology set forth in paragraph (c) of subdivision ten of section twenty-eight hundred seven-c of this article, provided, however, that for those facilities which do not receive a per diem add-on adjustment pursuant to subparagraph (ii) of paragraph (a) of this subdivision, rates shall be further adjusted to include the proportionate benefit, as determined by the commissioner, of the expiration of the opening paragraph and paragraph (a) of subdivision sixteen of this section and of paragraph (a) of subdivision fourteen of this section, and provided further that the operating cost component of rates of payment for those facilities which did not receive a per diem adjustment in accordance with subparagraph (ii) of paragraph (a) of this subdivision shall not be less than the operating component such facilities received in the two thousand eight rate period, as adjusted for inflation on an annual basis in accordance with the methodology set forth in paragraph (c) of subdivision ten of section twenty-eight hundred seven-c of this article and further provided, however, that rates for facilities whose operating cost component reflects base year costs subsequent to January first, two thousand two shall have rates computed in accordance with this paragraph, utilizing allowable operating costs as reported in such subsequent base year period, and trended forward to the rate year in accordance with applicable inflation factors.

§ 4. Subdivision 17-a of section 2808 of the public health law, as amended by section 73 of part C of chapter 58 of the laws of 2008, is amended to read as follows:

17-a. Notwithstanding any inconsistent provision of law or regulation to the contrary, for purposes of establishing rates of payment by governmental agencies for residential health care facilities for services provided on and after January first, nineteen hundred ninety-eight, the regional direct and indirect input price adjustment factors to be applied to any such facility's rate calculation shall be based upon the utilization of either nineteen hundred eighty-three, nineteen hundred eighty-seven or nineteen hundred ninety-three calendar year financial and statistical data and for periods beginning April first,

# EXHIBIT B

State Plaza, Albany, NY 12237, (518) 474-1673, (518) 473-8825 (FAX), PNM01@health.state.ny.us

## PUBLIC NOTICE

### Department of Health

Pursuant to 42 CFR Section 447.205, the Department of Health hereby gives public notice of the following:

The Department of Health proposes to amend the Title XIX (Medicaid) State Plan for long term care services to comply with recently enacted statutory provisions. The following significant changes are proposed:

Long Term Care Services:

• Effective for periods May 1, 2009 through March 31, 2010, regarding inpatient rates of payment for RHCFs which reflect the benefit of the rebase to 2002 costs, if it is determined by the Commissioners of Health and the Division of the Budget that such adjustment results in an aggregate increase in the rates for such period that is less than or more than $210 million, proportional adjustments to the rates will be made as necessary to result in an increase in aggregate expenditures of $210 million. The operating component of such rates will not be subject to case mix adjustments as otherwise scheduled for January of 2010.

• For the period April 1, 2010 through March 31, 2011, upon determination by the Commissioner and the Director of the Budget, rate adjustments to inpatient rates of payments for RHCFs, prior to the adjustment for inflation, will result in an aggregate increase in total Medicaid rates of payments for such services, make such proportional adjustments to such rates as necessary to reduce such total aggregate rate adjustments such that the aggregate total reflects no such increase. Adjustments made shall not be subject to subsequent correction or reconciliation.

The estimated annual net aggregate increase in gross Medicaid expenditures attributable to this proposed initiative for state fiscal year 2009/2010 is $210 million.

Copies of the proposed state plan amendment will be on file in each local (county) social services district and available for public review.

For the New York City district, copies will be available at the following places:

New York County
250 Church Street
New York, New York 10018

Queens County, Queens Center
3220 Northern Boulevard
Long Island City, New York 11101

Kings County, Fulton Center
114 Willoughby Street
Brooklyn, New York 11201

Bronx County, Tremont Center
1916 Monterey Avenue
Bronx, New York 10457

Richmond County, Richmond Center
95 Central Avenue, St. George
Staten Island, New york 10301

The public is invited to review and comment on this proposed state plan amendment.

*For further information and to review and comment, please contact:* Philip N. Mossman, Department of Health, Bureau of HCRA Operations & Financial Analysis, Corning Tower Bldg., Rm. 984, Empire State Plaza, Albany, NY 12237, (518) 474-1673, (518) 473-8825 (FAX), PNM01@health.state.ny.us

## PUBLIC NOTICE

### Madison County

Madison County has issued a Final Request For Proposals (RFP) dated April 2, 2009 to solicit proposals from companies that are interested in developing a facility in the County's Agriculture and Renewable Energy (ARE) Park that could utilize up to 438,000 therms per year of excess heat generated by a landfill gas to energy facility located in the Town of Lincoln at the county's landfill site on Buyea Road. Interested companies should request a copy of the Final RFP from Kipp Hicks, Director, Madison County IDA, 3215 Seneca Turnpike, Canastota, New York 13032 (Phone 315-697-9817; FAX: 315-697-8169; e-mail: director@madisoncountyida.com). Written proposals must be submitted no later than 3:00 p.m. on May 4, 2009 to Ms. Cindy Urtz, Madison County Purchasing Officer, P.O. Box 635, County Office Bldg., N. Court St., Wampsville, NY 13163.

## PUBLIC NOTICE

### Department of State

*Proclamation*

Revoking Limited Liability Partnerships

*WHEREAS,* Article 8-B of the Partnership Law, requires registered limited liability partnerships and New York registered foreign limited liability partnerships to furnish the Department of State with a statement every five years updating specified information, and

*WHEREAS,* the following registered limited liability partnerships and New York registered foreign limited liability partnerships have not furnished the department with the required statement, and

*WHEREAS,* such registered limited liability partnerships and New York registered foreign limited liability partnerships have been provided with 60 days notice of this action;

*NOW, THEREFORE,* I, Lorraine A. Cortés-Vázquez, Secretary of State of the State of New York, do declare and proclaim that the registrations of the following registered limited liability partnerships are hereby revoked and the status of the following New York foreign limited liability partnerships are hereby revoked pursuant to the provisions of Article 8-B of the Partnership Law, as amended:

DOMESTIC REGISTERED LIMITED LIABILITY PARTNERSHIPS

A

ADVANCED CENTER FOR PHYSICAL THERAPY LLP (03)

B

BAGG, ROSKE LLP (03)
BECKER HARROW LLP (03)
BIANCULLI & ROGAN, LLP (98)
BUDD, TRIBBLE & VON AHN, CPAS, LLP (03)

C

CAMPBELL GOLDEN LLP (03)
CINCOTTA & DONOFRIO, LLP (98)
CODISPOTI & MANCINELLI, LLP (98)
COHEN & FRANKEL LLP (03)

D

DANA L. JENKINS & ASSOCIATES, LLP (03)
DECOLATOR, COHEN & DIPRISCO, LLP (98)
DEPIETTO, BLUM, FALZARANO & CO, LLP (03)

E

ECONOMOU, PATRUNO & ECONOMOU, LLP (03)
ENDOCRINOLOGY DIABETES & OSTEOPOROSIS CONSULTANTS LLP (03)
EXCELDENT DENTAL OF MEDFORD LLP (03)

F

FLICKER, GARELICK & ASSOCIATES, LLP (03)
FOLEY & FOLEY, LLP (98)
FRANK E. DEESSO & PARTNERS, LLP (03)
FUOCO GROUP LLP (03)

# EXHIBIT C

STATE OF NEW YORK
DEPARTMENT OF HEALTH

Corning Tower The Governor Nelson A. Rockefeller Empire State Plaza Albany, New York 12237

Richard F. Daines, M.D.
*Commissioner*

James W. Clyne, Jr.
*Executive Deputy Commissioner*

January 13, 2010

Subject: 2002 Rebasing Rates
Effective April 1/May 1, 2009

Dear Administrator:

This letter provides formal notice that the Medicaid rates for your facility effective for the periods April 1, 2009 through April 30, 2009 and May 1, 2009 through December 31, 2009 ("April 1/May 1, 2009 Medicaid Rates") are now available on the Health Provider Network (HPN). With the completion of these rates, the Department is now able to complete the Upper Payment Limit calculation required by the Centers for Medicare and Medicaid Services (CMS) for the approval of State Plan Amendment(s). **Therefore, please be advised the April 1/May1 2009 rates are being provided as "notice" rates and will not be processed for payment (i.e., published) until all approvals have been received from both CMS and the New York State Division of the Budget (NYSDOB).**

The rates are all-inclusive for health care services provided at your facility, and reflect:

- 2002 Rebasing provisions implemented by Chapter 109 of the Laws of 2006, as modified and effective April 1, 2009 as provided by Chapters 2 and 58 of the Laws of 2009, pending receipt of all CMS and NYSDOB approvals.
- The application of the relative resource groups system of patient classification (RUG-III) employed by the Federal Government, effective April 1, 2009.
- Medicaid only case mix adjustments in accordance with Chapter 58, of the Laws of 2007, effective April 1, 2009.
- Chapter 58 of the Laws of 2009 requires rates for the April 1, 2009 through March 31, 2010 period include proportional adjustments which reflect the rebasing provisions of Chapter 109 of the Laws of 2006 and Medicaid only case mix implemented by Chapter 58 of the Laws of 2007 that result in an increase of total statewide Medicaid rates (excluding capital rates) that are no more or no less than $210 million. The proposed SPA amendment now before CMS implementing the $210 million provision has, in accordance with Federal Public Notice requirements, a May 1, 2009 effective date. Thus, the Department calculated Medicaid rates effective April 1, 2009 through April 30, 2009 that do not reflect this adjustment, and Medicaid

rates effective May 1, 2009 through December 31, 2009 that adjust such rates such that the aggregate adjustment in rates in effect for April 1, 2009 through March 31, 2010 result in aggregate Medicaid expenditures that are no more or no less than $210 million. The proportional adjustments to such rates were determined using each facility's proportionate share of their estimated Medicaid revenue from the April 1, 2009 rates that reflect the impact of rebasing and Medicaid only case mix. The rate adjustment to adjust spending to the required $210 million amount is reflected as the "scale back adjustment" on the May 1, 2009 rate sheet.

- Base year cost reports, for 2002 or subsequent base years as appropriate, re-filed and certified by April 15, 2009. The information contained in such cost reports has been included in the calculation of the statewide peer group prices, New York State Specific Weights for the 53 Group RUG-III Classification System, and the facility's rate, as applicable.

***REBASING PROVISIONS***

The April 1/May1, 2009 Medicaid rate methodology continues to employ a modified pricing system, which combines the aspects of a pure pricing system with the principles of a cost-based system. The direct and indirect components of the rate utilize portions of both systems, by comparing a facility's allowable operating costs to a base (minimum) and ceiling (maximum) price. The facility receives the higher of the base price or its cost up to the ceiling price.

The following information provides a summary of the rate setting methodology for the April 1/May 1, 2009 rates.

***Updating the base year:*** Effective April 1, 2009, the base year for the operating component of the rate (the sum of direct, indirect and non-comparable components) is the 2002 base year allowable costs from the 2002 cost report adjusted for inflation. The operating component of the rate for facilities which currently have a rebased rate which utilizes a cost report subsequent to 2002 is based on the allowable costs from the applicable base year cost report adjusted for inflation. (PHL §2808 2-b(b)(i)).

- Allowable operating costs from the 2002 cost report, after application of the appropriate traceback percentage, are used to calculate the direct, indirect and non-comparable components of the rate. The allowable operating costs for facilities with rates based on a base year that is subsequent to 2002 have been down trended from the base period to 2002 using the applicable Consumer Price Index (CPI) for the period. The base year costs for all facilities, 2002 or applicable down trended base costs, have been trended forward by the CPI, as adjusted by Legislative amendments for the period 2003-2009 (see ***Trend Factor*** for additional details).

- ***Hold Harmless Provision:*** Facilities which do not benefit from the use of the 2002 base year or subsequent base year are held harmless. To determine if a facility is held harmless, the Department compared the facility's 2002 base year or subsequent base year operating component (the sum of the direct, indirect and non-comparable component) trended to 2007 to the facility's December 31, 2008 operating component without the 2008 trend factor. The facility receives the higher of these two operating components. Facilities receiving the equivalent of their 2008 operating component without the 2008 trend factor are held harmless. In addition, the 2008 rate will not be lowered by the value of the productivity and efficiency expenditures as provided by PHL §2808 2-2(b)(i).

***Real Property Taxes and Payment in Lieu of Taxes (PILOT):*** The capital component of the rate continues to reflect property taxes and/or payments in lieu of property taxes reported in the facility's cost report two years prior to the rate year. Real Estate tax expenses reflected in the operating component will be eliminated (PHL §2808 2-b(b)(i)).

- The capital component of the rate is computed to reflect the full value, after application of the appropriate traceback percentage, of real estate taxes and payments made in lieu of real estate taxes as reported in the 2007 RHCF-4 cost report or other such report used as the basis to establish the real property component of the 2009 rate.

***Adjustments to the Direct Component of the Operating Component:*** The direct component of the April 1/May 1, 2009 rates is subject to case mix adjustment through the application of the relative resource utilization groups system of patient classification (RUG-III) employed by the Federal Government with regard to payments to skilled nursing facilities pursuant to Title XVIII of the Federal Social Security Act (Medicare). (See the Minimum Data Set section for additional details). The direct component of the April 1/May 1, 2009 rates, the higher of the base price or facility cost up to the ceiling price, is adjusted by the percentage change in case mix from the base period case mix, 2002 or subsequent base period, to the April 1/May 1, 2009 rate year case mix. For the April 1/May 1, 2009 rates the January 28, 2009 Census Roster MDS data is used for the case mix adjustment.

The direct operating component includes allowable therapy costs and associated overhead costs. Administrative overhead costs related to Pharmacy Services, the costs of non-prescription drugs, supplies and associated overhead is reflected in the non-comparable component of the rate (PHL §2808 2-b(b)(v)).

- Overhead expenses from the relevant indirect cost accounts are reallocated to the physical, occupational, and speech therapy direct cost accounts. The basis of the allocation is determined by the costs and statistics from a facility's base year cost report. For example, net square feet is the statistic (Exhibit J of the RHCF-4) associated with Plant Maintenance. Five hundred net square feet of a facility's 50,000 net square feet is allocated to the physical therapy department, or one percent of the total net square feet. Thus, one percent of the plant maintenance allowable costs, net of all associated adjustments and allocations, is the

overhead amount allocated from the plant maintenance account to the physical therapy account.

- The method to allocate fiscal and administrative service cost accounts, which do not have an associated statistic as reported on Exhibit H of the RHCF-4, is explained by the following example. Assume total reported physical therapy cost less associated capital is $200,000. The total reported facility costs, less capital as identified on line 001, 002 and 003 of Exhibit H are $16,000,000. Finding the percentage of therapy cost to total is:

  $200,000/$16,000,000 = 1.25%

  Thus, 1.25% of allowable fiscal and administrative costs, net of all associated adjustments and reallocations, is the overhead amount allocated to the physical therapy account. The administrative services overhead applicable to the pharmacy account is similarly calculated and reimbursed as a portion of the non-comparable component.

- The cost for medicine cabinet drugs, as reported on Schedule 6 of the RHCF-4, is used to determine the amount of non-prescription drugs which is reimbursed through the non-comparable component of the rate.

***Peer Group Ceilings:*** For the purpose of computing peer group cost ceilings for both the direct and indirect components of the operating component of the rate, facilities are grouped by the following peer groups (PHL §2808 2-b(b)(vi)):

- Free-standing facilities with less than 300 certified beds
- Free-standing facilities with 300 or more certified beds
- Hospital-based facilities

In addition, peer group ceilings for both the direct and indirect components of the operating component of the rate are calculated for the following specialty unit/facilities:

- Discrete AIDS
- Ventilator Dependent
- Traumatic Brain Injury
- Behavioral Intervention

Pediatric specialty unit/facilities continue to be exempt from peer group ceiling adjustments.

As enacted in the 2009/2010 Executive Budget, effective April 1, 2009, the occupancy factor has been eliminated from the operating component of the rate for a facility that is designated as an AIDS facility or as having an AIDS discrete unit.

The Department limited the number of facilities included in the peer group ceiling calculation by removing facilities at or above the 97th percentile and at or below the 3rd percentile prior to the calculation of each peer group ceiling identified above.

***Ceiling adjustment for all public facilities, and non-public facilities with fewer than 80 beds:*** Public facilities, and non-public facilities with fewer than 80 certified beds, which have direct or indirect costs over the ceiling receive a rate add-on of 50% of the difference between the facility specific direct (or indirect) cost per day and the direct (or indirect) ceiling cost per day (PHL §2808 2-b(b)(xi)).

***Corridors for each Direct and Indirect Statewide Mean Price:*** Pursuant to statute (PHL §2808 2-b(b)(vii)) the methodology to establish corridors around each statewide direct and indirect mean price is to:

- Establish a base that is no less than 85 percent and no greater than 90 percent of each mean direct and indirect price
- Establish a ceiling that is no greater than 115 percent and no less than 110 percent of each mean direct and indirect price
- Realize a total financial impact of the application of the ceiling that is substantially equal to the total financial impact of the application of the base

The corridors established for the April 1, 2009 rates are; for the base 90 percent of each mean direct and indirect price, and for the ceiling 115 percent of each mean direct and indirect price.

***2009 Per Diem Add-ons and applicable base year allowable cost adjustments:*** The operating component of the rate is adjusted to reflect per diem add-ons of:

- $8.00 per day trended from 2006 to 2009 (and thereafter) for each resident using the relevant MDS data who:

    - Qualifies under **both** the RUG-III impaired cognition **and** the behavioral problems categories **or**
    - Has been diagnosed with Alzheimer's disease or dementia, **and** is classified in the RUG-III reduced physical functions A, B, or C categories, **or** is classified in the RUG-III behavioral problems A or B categories; **and** has an activities of daily living index score of ten or less. (PHL §2808 2-b(b)(viii))

- $17.00 per day trended from 2006 to 2009 (and thereafter) for each resident whose Body Mass Index (BMI), using the relevant MDS data, is greater than thirty-five (35). (PHL §2808 2-b(b)(ix). Residents with a BMI greater than 35 have been identified using the weight and height data from the relevant MDS data. The Department is employing the formula used by the National Institute of Health to calculate a resident's BMI of: Weight-lbs/ (Height-inches {squared}) *703

Because of reporting problems with the weight and height data used to calculate a resident's BMI the Department has imposed the following limits to more accurately identify residents who quality for the BMI adjustment:

- Height must equal at least 48 inches
- Weight cannot be greater than 825 lbs.
- Calculated BMI must be greater than 35 AND less than 100

- $35.41 per day ($25.00 trended from 1996 to 2006) trended from 2006 to 2009 (and thereafter) for each resident identified as Traumatic Brain Injury – Extended Care (TBI-Extended Care) (PHL§2808 2-b(b)(iii). For the applicable base year allowable cost adjustment the TBI-Extended Care Residents have been identified by matching the applicable year Patient Review Instrument (PRI) data submitted by each facility. For the 2009 per diem add-on the TBI-Extended Care Residents have been identified from Section S of the 2009 MDS data.

An adjustment to remove the cost of residents eligible for the enhanced reimbursement add-ons identified above was made to the applicable base year cost to prevent duplicate reimbursement.

***Hepatitis B Vaccine:*** Pursuant to statute (PHL §2808 2-b(b)(iii)) the operating component of the rate is adjusted for the costs of Hepatitis B vaccination. The Hepatitis B vaccination adjustment per diem included in the April 1/May1, 2009 rates is a continuation of the Hepatitis B per diem from the facility's January 1, 2009 rate.

***Measles and Rubella Immunization Adjustment:*** The Measles and Rubella Immunization adjustment per diem included in the April 1/May 1, 2009 rates is a continuation of the Measles and Rubella Immunization per diem from the facility's January 1, 2009 rate.

***Criminal Background Checks***: The criminal background check adjustment in the April 1/May 1, 2009 rates is a continuation of the criminal background check per diem from the facility's January 1, 2009 rate.

***Dementia Grants***: The dementia grant adjustment per diem in the April 1/May 1, 2009 rates is a continuation of the dementia grant per diem from the facility's January 1, 2009 rate.

***Wage Equalization Factor (WEF):*** The WEF is utilized to compensate for wage differential in various regions across the State.

- Effective April 1/May 1, 2009 the WEF has been calculated based on employee compensation as reported in the 2002 and/or subsequent 2002 base year RHCF cost report.
- The WEF calculation includes salaries and fringe benefits for Registered Nurses (RNs), Licensed Professional Nurses (LPNs), Certified Nursing Aides (Aides), Therapists, and Therapist Aides.

- The regional corridors are established pursuant to statute and adhere to a statewide value of ten percent.
- The Department limited the number of facilities included in the WEF calculation by removing facilities at or above the 95th percentile and at or below the 5th percentile prior to the calculation of the WEF.

***Part B and Part D adjustments:*** **The Part B** offset amount in the April 1/May 1, 2009 rates is the Part B offset from the facility's January 1, 2009 rate downtrended to 2007. **The Part D** offset is calculated by removing the cost of prescription drugs from the facility's allowable cost as well as from the associated peer group to determine the allowable direct component excluding the cost of drugs and comparing the results of this calculation with the allowable direct component with the cost of Drugs. The Difference in these two calculations is the amount of the part D offset.

***Trend Factor:*** Pursuant to Chapter 109 of the Laws of 2006, the rebased rates are trended from 2002 to 2009 using the Consumer Price Index (CPI) as adjusted by legislative amendments. For purposes of down trending where applicable, the CPI was applied. .

| | 2003 Final CPI | 2004 Final CPI | 2005 Final CPI | 2006 Final CPI | 2007 Final CPI | 2008 Initial CPI | 2009 Initial CPI |
|---|---|---|---|---|---|---|---|
| CPI | 2.30 | 2.70 | 3.40 | 3.20 | 2.80 | 2.30 | 3.10 |
| CPI w/Legislative Amendments | 2.30 | 2.70 | 3.40 | 2.95 | 2.10 | 0 | 0 |

***Capital Rates - RHCF-4 & RHCF-2 Filers:*** The capital component of the April 1/May 1, 2009 rates reflect the same capital component as the January 1, 2009 "Hotline" rates which use the 2007 costs from the applicable 2007 RHCF-4 cost report for RHCF-4 filers or as allocated from the 2007 ICR for RHCF-2 filers. The January 1, 2009 "Hotline" rates were sent to facilities via a DAL dated September 16, 2009.

*MINIMUM DATA SET*

***Base Year Minimum Data Set (MDS):*** Pursuant to statute, the April 1, 2009 Medicaid rates are subject to case mix adjustments through application of the relative resource utilization groups system of patient classification (RUG-III) employed by the Federal Government for payments to skilled nursing facilities pursuant to Title XVIII of the Federal Social Security Act (Medicare). The reimbursement system will employ the MDS 2.0 or subsequent revisions as approved by the CMS. The reimbursement system will also employ the 53 Group RUG-III Classification System model version 5.20

For facilities with a 2002 base year cost report a 2002 MDS database was developed using a four quarter mid-point methodology which identified each resident's MDS by the assessment

reference date (ARD) closest to the mid-point of each quarter. For facilities with a base year cost report subsequent to 2002 an MDS database was developed using a four quarter mid-point methodology which identified each resident's MDS by the ARD closest to the mid-point of each quarter matching the 12 month ('off- year') cost report period.

If more than one MDS was identified for a resident within a quarter, the MDS with the ARD closest to the mid-point was selected. In cases where two MDS submissions for the same resident were equal distance from the mid-point the earlier MDS with an ARD before the mid-point was selected. This methodology was used for all four quarters of the applicable base year, 2002 or off-year, consequently the MDS counts in the base year data used for rates effective 2009 contain more MDSs than beds.

Each facility's base year MDSs are RUGed, using the 53 Group RUG-III Classification System, Index Maximization, and New York State specific weights resulting in each facility's 'frozen' base year MDS case mix index.

Residents eligible for specialty unit/facility reimbursement for discrete AIDS, Ventilator Dependent, Traumatic Brain Injured, and Behavioral Intervention are identified by matching the frozen base year MDS data to the applicable year Patient Review Instrument (PRI) data submitted by each facility. Residents eligible for the enhanced reimbursement "add-on" for Traumatic Brain Injured – Extended Care are also identified by matching the frozen base year MDS data to the applicable year PRI data submitted by each facility.

In addition, the Department agreed to refine the Mid-Point methodology described above to identify MDS records by payer and to weight such MDS records by the portion of Medicare and all other days as reported in the Residential Health Care Facility (RHCF) cost reports. This adjustment is in response to a recent request by the Joint Association Task Force (which collectively includes the New York State Health Facilities Association-NYSHFA, New York Association of Homes and Services for the Aging-NYAHSA, and Healthcare Association of New York State-HANYS) to address an over sampling of Medicare MDS that may result in an overstatement of the base year case mix.

***New York State Specific Weights for 53 Group RUG-III Classification System:*** New York State specific weights have been developed that reflect New York State wages and fringe benefits increased by the statutory amounts for residents in the impaired cognition A, impaired cognition B, and reduced physical function B categories.

The data used to determine the relative weights was developed using the 2002 base year MDS database, the Federal staffing minutes for RNs, LPNs, Aides, Therapists, and Therapist Aides for each RUG group from the 1995 and 1997 time study, and the statewide dollar per hour for all the job categories listed above from the 2002 Medicaid cost reports.

Each RUG category is assigned an index score that represents the amount of nursing time and rehabilitation treatment time associated with caring for the residents who qualify for the groups.

The methodology to determine the relative weight of each RUG group is as follows:

- Determine the number of residents per RUG category using MDS Hierarchical scoring
- Multiply total minutes by statewide average dollar per minute resulting in the overall average cost
- Multiply the overall average cost by the resident count of MDSs and add all five staffing levels together to calculate the total staffing cost per resident
- Divide the total staffing cost per resident by the resident counts to determine an average cost per resident
- The relative weight is determined based on each RUG category's average cost as compared to the total average cost

It should be noted that the New York State specific weights have changed from the weights used in the 2009 rates provided with the DAL of December 8, 2008 due to the re-filing of 2002 cost reports by approximately twenty-five percent (25%) of the facilities.

***MDS Data (2009 Forward) for Case Mix Adjustment to the Rate:*** PHL §2808 2-b(b)(ii) requires case mix adjustments be made in January and July of each calendar year. The Department has provided additional information in DALs detailing the policy and procedure for processing the MDS assessment data for Medicaid rate setting purposes for January and July of each calendar year.

The MDS data for the April 1/May 1, 2009 rates reflect the MDSs "culled" as a result of the statewide re-upload of the January 28, 2009 Census Rosters. The January 28, 2009 census roster re-upload was a ONE TIME RE-UPLOAD to avoid significant declines in rates that would have occurred for facilities that failed to timely file their Federal MDS data as required by CMS. Therefore, the Department again reminds facilities that they MUST file their MDS data in accordance with the timeframes established by CMS. The Department will notify facilities of the CMI adjustment for the July 29, 2009 census roster upload (rates effective July 1, 2009) under separate cover.

Statute requires that effective April 1, 2009 and forward that Case Mix adjustments be made for Medicaid residents only. Therefore the case mix adjustment used to calculate Medicaid rates effective April 1, 2009 and forward is based on the applicable facility census roster (January/July) MDS data for the case mix of a facility's Medicaid residents as reported on Section S of the MDS.

***AUDITS***

As a reminder, please note that cost reports submitted for the 2002 calendar year or any subsequent year used to determine the operating component of the April 1, 2009 rate will be subject to audit through December 31, 2014. (PHL §2808 2-b(d)).

*ADULT DAY HEALTH CARE (ADHC) RATES*

Information on the April 1, 2009 ADHC rates will be provided in a separate DAL.

*APPEALS*

***Capital Rate Appeals:*** Since capital appeals related to the initial January 1, 2009 rates transmitted by the December 8, 2008 DAL remained valid the Department will not accept appeals to the 2009 capital component of the April 1/May 1, 2009 rates. The deadline for appeals to the capital component of the initial January 1, 2009 rates was April 15, 2009. In addition, for facilities that had a 2009 Hotline capital appeal processed the deadline to file appeals to the Hotline appeal was October 23, 2009. Therefore, the Department will also not accept any capital appeals to the Hotline appeals. Please note, however, that any capital appeal timely submitted in accordance with the above due dates will be "rolled" into the April 1/ May1, 2009 rates, if applicable, when processed.

***Operating Rate Appeals:*** Facilities are reminded that effective April 1, 2009, statute provides the Department will only review operating rate appeals for the correction of computational errors or omissions of data by the Department in determining the operating rate based upon information submitted to the Department prior to the computation of the rate. This applies to all administrative operating appeals submitted to the Department on or after April 1, 2009, regardless of the period they pertain to. Thus, all operating appeals submitted under the timeframes provided in this DAL must be in accordance with these provisions. Operating rate appeals submitted that are not in accordance with these provisions are invalid.

Facilities are also reminded that effective April 1, 2009 the Department will not consider any revisions made to a facility's annual cost report (regardless of the year the cost report applies to) for operating adjustment purposes later than the due date established by the Commissioner. Thus, revisions to the 2002 or subsequent base period cost report, which was due April 15, 2009, will not be accepted by the Department.

**Facilities will have 120 days from the date of this letter to submit appeals to the April 1/May1, 2009 rates. As noted above the Department will not accept capital component appeals and will only accept operating rate appeals for the correction of computational errors or omissions of data by the Department in determining the operating rate based upon information submitted to the Department prior to the computation of the rate. Please be advised that there will not be an accelerated administrative process ("Rate Hotline") to correct any errors for these rates. In addition the Department will not accept appeals to the MDS data used for either the base year "frozen" case mix or the MDS data "culled" as a result of the January 28, 2009 census roster submitted by the facility for the case mix adjustment effective in the April 1/May1, 2009 rates.**

***APPEAL SUBMISSIONS FOR RHCF-4 FILERS*** *(Freestanding facilities and Hospital-Based facilities filing on the RHCF-4 cost report):*

As indicated in the Department's March 3, 2009 DAL (available on the HPN), appeals submitted on or after April 15, 2009 by mediums other than the new **Electronic Appeals Submission (EAS) System** will not be accepted. The EAS is accessed through the HPN. Detailed instructions regarding initial access through the HPN were provided in the E-mail transmitting the above noted March 3, 2009 DAL.

The EAS System contains features to provide users with assistance, including links to frequently asked questions (FAQs), a User Guide (Help), and access to regulations related to Medicaid reimbursement for nursing homes (i.e., Title 10 of the New York Code of Rules and Regulations (10 NYCRR)). Most screens provide a small tool bar for the user, allowing creation of a new appeal or quick access to the "appeal search" mechanism.

Questions or issues regarding using the new EAS that cannot be resolved by the FAQs or Help links should be submitted via E-mail to the DOH's Bureau of Long Term Care Reimbursement at: nfrates@health.state.ny.us.

*The new EAS System accessed through the HPN is available only for Freestanding facilities and Hospital-Based facilities filing on the RHCF-4 cost report.*

***APPEAL SUBMISSIONS FOR RHCF-2 FILERS*** *(Hospital-Based facilities filing on the RHCF-2 cost report):*

**Hospital-Based facilities filing on the RHCF-2 cost report MUST continue to submit appeal requests in hardcopy mailing to the Department.**

The appeal submission for RHCF-2 filers and any related information associated with the appeal **MUST** be forwarded to the following address:

Mr. John Gahan
Director
Bureau of Primary and Acute Care Reimbursement
Corning Tower Building, Room 1043
Empire State Plaza
Albany, New York 12237

RHCF-2 filers that file an appeal with the Bureau of Primary and Acute Care Reimbursement must provide the following information:

- ✓ A cover letter, signed by the Operator or Chief Executive Officer, containing a summary of the items of appeal.

- ✓ Supporting schedules or any other pertinent data must be included with the facility's appeal letter.

***ASSISTANCE AND QUESTIONS REGARDING THE APRIL 1/MAY 1, 2009 RATES***

***Email Address***

To provide you assistance in understanding the methodology used to calculate your April 1, 2009 rates, and effectively manage and be responsive to the volume of inquiries the Department has established the following email address which we are requesting you use to submit questions and inquiries regarding the contents of this letter and the computation of your April 1/May 1, 2009 rates.

**nfrates@health.state.ny.us**

All email correspondence **should include the facility name in the subject line,** along with the operating certificate number, the sender's phone number, and question(s) in the body of the email.

***Webinar***

The Department will be conducting a "Webinar" to review the elements of the new 04/01/2009, 05/01/2009 and 01/01/2010 rates and rate methodology (2002 rebasing). The Webinar will provide a forum for facilities to participate in an educational seminar concerning the new rate methodology via the internet. After each portion of the Webinar questions may be posted electronically. Each of these questions will be answered as time allows during the Webinar, and answers to all questions will be posted on the Nursing Home section of the HPN as soon as possible. Due to the anticipated size of the audience and time constraints it will not be possible to take oral questions during the webinar.

Details of the Webinar, including the Web address, date, time and registration information will be provided in an email to facilities as soon as possible.

Sincerely,

John E. Ulberg, Jr.
Director
Division of Health Care Financing